# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMILLA CLARK and ARWA AZIZ, on Behalf of Themselves and Others Similarly Situated, and TURNING POINT FOR WOMEN AND FAMILIES,

Plaintiffs,

-against-

CITY OF NEW YORK,

Defendant.

No. ______________

**CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs Jamilla Clark and Arwa Aziz, on behalf of themselves and others similarly situated (collectively, the "Class" or "Class Plaintiffs"), and Turning Point for Women and Families, by and through their attorneys, Emery Celli Brinckerhoff & Abady LLP and the Council on American-Islamic Relations New York Inc., for their Complaint allege as follows:

## PRELIMINARY STATEMENT

1. Plaintiff Jamilla Clark, a practicing Muslim-American woman, sobbed in One Police Plaza with her hijab pushed down around her shoulders. She had been arrested for violating a bogus protective order filed by her abusive ex-husband. Her head and hair were now uncovered. NYPD officers had threatened to prosecute her if she did not remove her hijab, a headscarf she wore daily to cover her hair and signify modesty and devotion to the Muslim faith. Like many Muslim women whose religious beliefs dictate that they wear a hijab, Ms. Clark felt exposed and violated without hers—as if she were naked in a public space. A NYPD officer took a photograph of Ms. Clark as she wept and begged to put her hijab back on. The officer ignored Ms. Clark, stored the photograph in an online database and in Ms. Clark's paper file, and

showed it to numerous male officers. Another officer openly mocked the Muslim faith. Ms. Clark—humiliated, distraught, and panicked from this coerced violation of her religious practice—still worries that her photograph is regularly seen by NYPD officers or members of the public.

2. Eight months later, Plaintiff Arwa Aziz, a practicing Muslim-American woman, sobbed at 120 Schermerhorn Street in Brooklyn with her hijab pushed down around her shoulders. She had also been arrested for violating a bogus protective order filed by her vindictive sister-in-law. She stood with her back to a wall, in full view of approximately one dozen male NYPD officers and more than thirty male inmates. For nearly five minutes, NYPD officers had been taking photographs of Ms. Aziz, her head and hair uncovered, from multiple angles. The officers refused to allow Ms. Aziz to keep her hijab on while having her picture taken. They refused to allow her to push her hijab back slightly, exposing her hairline and ears. They told her, falsely: "It's the law." Frantic, weeping, and bareheaded in a hallway full of men who do not belong to her immediate family, Ms. Aziz felt broken.

3. Plaintiff Turning Point for Women and Families ("Turning Point") is a nonprofit organization that advocates for and assists Muslim women and girls who have been the victims of domestic violence. Many women whom Turning Point serves have experienced, like Ms. Clark and Ms. Aziz, the forced removal of their head coverings by NYPD officers for post-arrest photographs. Many of these arrests, like Ms. Clark's and Ms. Aziz's, stem from specious charges lodged by abusive family members.

4. Ms. Clark and Ms. Aziz endured this trauma and anguish because of an official NYPD policy that forces arrestees to remove their religious head coverings for an official Department photograph (the "Booking Photograph") that is kept forever, visible to all who can

Case 1:18-cv-02334-AT-KHP Document 1 Filed 03/16/18 Page 3 of 27

access the NYPD's main database or have occasion to view an arrestee's paper file. This unnecessary and discriminatory policy is out of step with national norms, federal and state law, and the United States Constitution.

5. The NYPD's policy of requiring arrestees to remove religious head coverings for photographs is unlawful. This kind of substantial burden on religious practice is directly prohibited by the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"). "A Muslim woman who must appear before strange men she doesn't know, with her hair and neck uncovered in a violation of her religious beliefs, may feel shame and distress. This is precisely the kind of 'mischief' RLUIPA was intended to remedy." *Khatib v. County of Orange*, 639 F.3d 898, 907 (9th Cir. 2011) (Gould, J., concurring). The NYPD's policy also contravenes the First Amendment to the United States Constitution; Article 1, Section 3 of the New York State Constitution; and New York State law.

6. This civil rights class action seeks damages and declaratory and injunctive relief to (a) compensate Class members for the severe emotional damages they have suffered; (b) compensate Turning Point for the diversion of its resources toward investigating and combating Defendant's unlawful policy and for the frustration of its mission of promoting the civil and legal rights of Muslim-American citizens; and (c) enjoin Defendant from continuing to implement the NYPD policy requiring the removal of all religious headgear for Booking Photographs.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the New York State law claim pursuant to 28 U.S.C. § 1367.

8. The instant action arises under the Religious Land Use and

Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*, and the First and Fourteenth Amendments to the United States Constitution.

9. The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and/or omissions giving rise to the claims occurred in the District.

**PARTIES**

10. Plaintiff Jamilla Clark currently resides in Cedar Grove, New Jersey.

11. Plaintiff Arwa Aziz currently resides in Brooklyn, New York.

12. Plaintiff Turning Point is a private non-profit organization based in Queens County, New York and serving Queens County and other counties city-wide. Turning Point is organized under the laws of New York, with its principal place of business in Flushing. Turning Point's primary objective is to support and advocate for Muslim women and girls affected by domestic violence. Turning Point accomplishes this objective through a variety of means, including direct services, advocacy, and referrals throughout the region in which it operates, including in the Southern District of New York.

13. Defendant City of New York (the "City") is and was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department (the New York City Police Department or "NYPD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The NYPD is a duly authorized public authority able to perform all functions of a police department under the applicable sections of the New York State Criminal Procedure Law. Defendant City assumes the risks incidental to the maintenance of the NYPD's police force and the employment of police officers.

## JURY DEMAND

14. Plaintiffs demand a trial by jury in this action.

## FACTUAL ALLEGATIONS

15. This case is about an NYPD policy that violates the First Amendment as well as other federal and state law. Pursuant to this policy, NYPD officers force arrestees who wear religious head coverings to remove those head coverings for a photograph, even where doing so violates the arrestees' sincerely-held religious beliefs. This practice alienates and oppresses faith communities throughout New York City. It lacks justification and must be changed.

***The Hijab***

16. Ms. Clark and Ms. Aziz both wear a hijab pursuant to their Muslim faith. For the purposes of discussing the NYPD's policy, the term "hijab" is used throughout this Complaint to refer to a garment worn by many Muslim women in various parts of the world; it is a headscarf that covers the wearer's hair, ears, and neck, and frequently part of her chest, but leaves her entire face exposed. In Arabic, the word "hijab" derives from the word "*hajaba*," sometimes translated as to hide or screen from view or to cover. Wearing a hijab is also known as "covering." Neither Ms. Clark nor Ms. Aziz wears a niqab, or a face veil.

17. For many observant Muslim women, the practice of covering entails wearing one's hijab at all times, whether at home or in public, when the wearer is in the presence of men who are not part of her immediate family ("*mahram*").

18. While women choose to wear the hijab for an array of reasons, many believe that the hijab fulfills the commandments of modesty and devotion that stem from, among other things, the *Qur'an*, the primary holy book of the Muslim faith, and the *hadith*, oral

traditions carried down from the age of the Prophet Mohammed (S.A.W.).[1] Ms. Clarke, Ms. Aziz, and other women who cover frequently view wearing the hijab as a mandatory aspect of Muslim identity and faith.

19. Ms. Clark and Ms. Aziz both wear hijabs because their faith dictates that no man outside of a woman's *mahram* should see her uncovered hair, head, and neck. Both presently wear hijabs every single day and believe that their religious faith requires them to do so. Ms. Clark has covered regularly for nearly ten years and daily for the past year. Ms. Aziz has done so daily for seven years. The hijab is core to both women's identities. It is an essential part of who they are.

20. Being forced to remove one's hijab in public, particularly in the presence of men who do not belong to the wearer's *mahram*, is a profound defilement of the wearer's sincerely-held religious beliefs and a violation of her religious practice. Requiring a Muslim woman to remove her hijab in public is akin to demanding that a secular person strip naked in front of strangers.

***NYPD Establishes Its Unlawful Photograph Policy in March 2015***

21. On March 2, 2015, the NYPD implemented Interim Order 29. Upon information and belief, Interim Order 29 was passed in response to ongoing civil rights litigation and to establish protocols for taking post-arrest photographs of arrestees who refuse to remove their religious head coverings in the presence of NYPD officers.

---

[1] The phrase "S.A.W." is shorthand for "*ṣallā Allāhu ʿalayhi wa salam*," a phrase that translates to "God's blessings and peace be upon him" and that is frequently used to express love and respect for the Prophet.

22. Upon information and belief, prior to March 2, 2015, the NYPD had no formal policy governing how to photograph arrestees who refuse to remove their religious head coverings.

23. Interim Order 29 states:

> In order to accommodate arrestees who refuse to remove their religious head covering for an official department photograph, the Department has authorized the Mass Arrest Processing Center (MAPC) at One Police Plaza be available so that an arrestee can remove their religious head covering and have their photograph taken in private . . . the Department requires that an official photograph be taken of an arrestee with an unobstructed view of the arrestee's head, ears, and face.

24. In contrast, Interim Order 29 explains, the "photograph taken at the command of arrest for the Prisoner Movement Slip is not considered an official Department photograph. That photograph is taken for identification purposes only and may be taken while the arrestee wears their religious head covering."

25. Interim Order 29 does not explain how the purpose of the MAPC photograph (without hijab), referred to herein as the Booking Photograph, differs from the Prisoner Movement Slip photograph (with hijab) that is "taken for identification purposes."

26. Interim Order 29 amended Patrol Guide 208-03, "Arrests – General Processing," in two ways. First, Interim Order 29 required that Desk Officers take certain steps if an arrestee "indicates a refusal to remove their religious head covering for the official Department photograph at borough Court Section." The Desk Officer must begin by notifying Manhattan Court Section. The Desk Officer must then:

a. Inform Manhattan Court Section of the gender of the arrestee in order to have a member of the service of the same gender available to take the official Department photo.
b. Direct arresting officer to transport prisoner to the Mass Arrest Processing Center (MAPC) at One Police Plaza, between 0800 and 2400 hours, where

Case 1:18-cv-02334-AT-KHP Document 1 Filed 03/16/18 Page 8 of 27

the arrestee will have an official Department picture taken without their religious head covering.

c. Direct arresting officer to transport prisoner to the respective borough Court Section upon completion of the official Department photograph at the MAPC.

27. Interim Order 29 also tasks the Borough Court Section Supervisor with carrying out the same steps prescribed for the Desk Officer.

28. Finally, Interim Order 29 amends Patrol Guide 208-07, "Photographable Offenses," to include the following:

> Additional Data: If arrestee refuses to remove their religious head covering for a photograph taken for identification purposes (i.e., Prisoner Movement Slip), the arresting officer will take a digital photograph of the arrestee wearing their religious head covering. The arresting officer will then inform the arrestee that the Department is required to take an official Department photograph at the borough Court Section in which the arrestee[']s head covering must be removed. If the arrestee indicates that they will continue to refuse to remove their religious head covering at the borough Court Section they will be informed that they will be transported to the prisoner photography facility at the Mass Arrest Processing Center (MAPC), at One Police Plaza between 0800 and 2400 hours where their head gear will be removed and an official Department photograph will be taken in privacy. Furthermore, the arrestee will be informed that their arrest processing may be delayed due to operational requirements incumbent in using the MAPC. Notification to Manhattan Court Section must be made before the arrestee is transported.

29. Upon information and belief, Booking Photographs are integrated into other law enforcement databases, including the NYPD's so-called "Forensic Imaging System," that use sophisticated facial recognition software.[2] This practice increases the likelihood that images of arrestees without their religious head coverings will be viewed by many people long after the Booking Photograph is taken.

---

[2] *See* http://www.nydailynews.com/new-york/nyc-crime/nypd-ripped-abusing-facial-recognition-tool-article-1.3847796 (last accessed March 4, 2018).

30. Interim Order 29 Section 4 provided that "[a]ny provisions of the Department Manual or any other Department directive in conflict with the contents of this Order are suspended."

31. Patrol Guide 208-03, effective January 16, 2018, and Patrol Guide 208-07, effective March 2, 2015, implement the changes set forth in Interim Order 29 verbatim.

32. Upon information and belief, the NYPD does not consistently apply its Booking Photograph policy as set forth in Interim Order 29, Patrol Guide 208-03, and Patrol Guide 208-07 (collectively, the "Photograph Policy"). For example, on September 16, 2016, Ms. Rabab Musa was arrested in Manhattan on charges not made known to her. At the precinct, after being strip searched, Ms. Musa was then forced to remove her hijab while a male NYPD Officer took her picture on his cell phone. Ms. Musa was not given the opportunity to have her photograph taken in private, by a female officer, at One Police Plaza. Ms. Musa filed a lawsuit in New York Supreme Court on February 20, 2017, alleging various violations of her religious rights.

***Federal, State, and Local Governments Across the United States Recognize the Religious Interest in the Hijab and Permit it to be Worn in Official Photographs***

33. The NYPD's Photograph Policy contravenes national norms and practices. From the federal to the local level, government and law enforcement entities recognize the significant constitutional and statutory interests at play and permit those in custody to wear religious head coverings for the purpose of official photographs.

34. The United States Department of State permits those who wear hats or head coverings for religious reasons to keep those coverings on in official passport photographs. The Department of State website allows those being photographed to wear a religious hat or head covering if they "submit a signed statement that verifies that the hat or head covering in [the

person's] photograph is part of recognized, traditional religious attire that is customarily or required to be worn continuously in public."[3]

35. Similarly, the United States Citizenship and Immigration Services ("USCIS") issued a policy memorandum on July 23, 2012 that permits religious head coverings to be worn in photographs. The memorandum states that "USCIS will accommodate an individual who wears headwear as part of their religious practices."[4] Should a head covering cast a shadow over the wearer's face or otherwise obscure part of their face, USCIS will "ask an individual to remove or adjust portions of religious headwear that covers all or part of the individual's face." In this situation, USCIS will offer the wearer a private room or screened area in which to adjust their head covering as well as a photographer of their gender. The religious head covering in question "is allowed to cover the ears if USCIS can still identify the individual."

36. The New York State Department of Motor Vehicles Regulations of the Commissioner, 15 CRR-NY 3.8, "Photographic driver licenses," also permit an applicant for a driver's license to keep her hijab on while having her official driver's license photograph taken. In July 2007, officials at the Department of Motor Vehicles sent letters of reminder to offices throughout New York State regarding head coverings and their approved use in driver's license photographs.

---

[3] *Available at* https://ru.usembassy.gov/u-s-citizen-services/passports/photos/ (last accessed March 4, 2018).

[4] *Available at* https://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2012/August%202012/Accommodating%20Religious%20Beliefs%20PM.pdf (last accessed March 4, 2018).

37. Law enforcement officials across the country have likewise recognized the right of citizens to wear hijabs or other religious head coverings while being photographed for official government purposes.

38. In Dearborn Heights, Michigan, the Police Department changed its booking procedures in July 2015 after a woman was forced to remove her hijab in the presence of men during the booking photograph and while in custody. The Police Department implemented reform after that woman filed suit alleging violations of her religious rights. According to the updated policy, Muslim women are not required to remove religious head coverings like hijabs for any booking photograph. At least one additional lawsuit has been settled under the new policy, which recognizes the substantial religious interests of women who wear hijabs.

39. In Long Beach, California, the City Council approved a July 2017 settlement between a woman required to remove her hijab for a post-arrest photograph and the Long Beach Police Department that amended the Department's official policy so as to accommodate persons who wear religious head coverings. The Department is no longer permitted to forcibly remove the hijabs of female arrestees at any point while they are in custody.

40. In amending its policy, Long Beach joined two neighboring jurisdictions, San Bernardino County and Orange County, which adopted policies protecting detainees who wear religious head coverings following lawsuits that settled in 2008 and 2013 respectively.

41. In Hennepin County, Minnesota—the county that includes Minneapolis—the Sheriff's Office implemented a new policy for inmates at the Hennepin County Jail and those in custody throughout Hennepin County in March 2014. The policy permits female arrestees to keep their hijabs on while a booking photograph is taken, and provides that the hijab can be

pushed back slightly off of the wearer's face if necessary. Inmates at the County Jail are permitted to wear hijabs while incarcerated.

42. In Portland, Maine, Cumberland County Sheriff Kevin Joyce publicly apologized after releasing the booking photographs of two Muslim women who had been arrested at a Black Lives Matter protest. The photographs showed each woman without her hijab; Joyce offered his "sincerest apologies . . . to the Muslim community for the appearance that we are disrespecting their religious beliefs and practices."[5] The Cumberland County Jail procedures require a woman to remove her hijab only in private, without men present, and provide that two booking photographs will be taken, one with the woman's hijab and another without.

43. Each of these examples reflects a growing national consensus that there is no basis to require the removal of religious head coverings for official government photographs.

44. Even the NYPD has recognized the harm its Photograph Policy may cause Muslim women. Three Muslim women reached a settlement with the City on February 26, 2018, pursuant to which the City agreed to pay $180,000 in damages for the forced removal of the women's hijabs pursuant to the Photograph Policy.[6] Upon information and belief, however, the Photograph Policy remains in place despite this settlement. Even if a Muslim woman is able to have her Booking Photograph taken in private by another woman at One Police Plaza, the Booking Photograph itself remains in the NYPD's database indefinitely—available to all who access the computer system or the woman's paper file.

---

[5] *Available at* https://www.pressherald.com/2016/09/14/sheriffs-office-apologizes-for-improperly-releasing-photos-of-muslim-protesters/ (last accessed March 4, 2018).

[6] *Available at* https://www.nytimes.com/2018/02/28/nyregion/muslim-hijab-nypd.html (last accessed March 4, 2018).

***The NYPD's Unlawful Photograph Policy Forces Muslim Women to Violate Their Religion***

45. Federal legislation has been enacted to demonstrate our robust national commitment to the free exercise of religion and to prohibit the government from placing a substantial burden on religious beliefs. This legislation, which reflects an increased awareness of and support for religious interests in practices like covering, "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by . . . the Constitution." 42 U.S.C. § 2000cc-3(g). The statute even "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." *Id.* § 2000cc-3(c).

46. In contravention of this legislation and the tolerant, inclusive policies it embodies, the NYPD's Photograph Policy has had an extensive and corrosive effect on Muslim-American women in New York City—and, upon information and belief, on other New York City residents who wear religious head coverings and are arrested by the NYPD.

47. Moreover, the Photograph Policy is a profound manifestation of insensitivity towards religious practices and interests. In today's post-9/11 climate, New York City is beset with widespread hostility towards and baseless fear of Muslim-Americans. In the context of this increasingly polarized setting, it is incumbent on this City's law enforcement to increase awareness of and sensitivity towards the Muslim-American community by setting an example in their arrest and booking practices. The Photograph Policy has precisely the opposite effect.

48. The NYPD's Photograph Policy also substantially impacts the very population Turning Point exists to serve. Many of Turning Point's constituents have been forced by NYPD officers to remove hijabs and other religious head coverings for post-arrest

photographs. The Photograph Policy has, for this reason, harmed Plaintiff Turning Point, which advocates for Muslim women and girls throughout New York City.

49. As a result of the Photograph Policy, Turning Point diverted its limited resources to respond to allegations by its members that they had been forced to remove their hijabs for the Booking Photograph while in custody and that the Photograph Policy had violated their constitutional and statutory rights. These resources include staff time to obtain information from their clients; offering counseling services for clients traumatized by the Photograph Policy; reviewing relevant documents; analyzing the results of the investigation and information obtained from constituents; meeting with Turning Point Executive staff, Board members, and legal counsel; and communicating with clients. Turning Point plans to implement further measures to remedy the Photograph Policy's harm to the community, including but not limited to youth outreach and a "Know Your Rights" campaign.

50. In addition to diverting Turning Point's resources, Defendant's conduct has frustrated Turning Point's stated mission to protect the legal rights of Muslim women and girls, especially those who have been victims of domestic violence or abuse. For example, Ms. Clark was arrested on a false charge filed by her abusive ex-husband, and Ms. Aziz was arrested on a false charge filed by a vindictive family member. Defendant's Photograph Policy disregards the interest of Muslim women in retaining their hijabs for Booking Photographs. The NYPD's indifference to the substantial burden its Photograph Policy places on the free exercise of religion contravenes Turning Point's mission of improving awareness of and protection for Muslim-American women.

***Jamilla Clark and Arwa Aziz are Subjected to the Photograph Policy***

51. Both Jamilla Clark and Arwa Aziz were forced to remove their hijab against their will and their religion, pursuant to the Photograph Policy.

***Jamilla Clark is Forced to Remove Her Hijab at One Police Plaza for a Photograph***

52. After her ex-husband falsely complained that she had violated an order of protection, Plaintiff Jamilla Clark was taken into custody at Manhattan Family Court on January 9, 2017. Ms. Clark's ex-husband fabricated these charges to secure immigration status as a purported victim of domestic violence; Ms. Clark had previously been arrested on the same charges, but they were ultimately dismissed.

53. Ms. Clark informed the arresting officers that, as a practicing Muslim, she could not be physically contacted by any men and was required to wear her hijab at all times. Officers took Ms. Clark to Manhattan's South Precinct and photographed her with her hijab on. The officers permitted Ms. Clark to pray in a holding room.

54. Later that day, however, Ms. Clark was transferred to NYPD Central Booking for New York County, where officers ordered her to remove her hijab for a second Booking Photograph. Ms. Clark refused. She told officers that she could not remove her hijab in front of men who do not belong to her immediate family because of her Muslim faith. One NYPD employee requested that a female colleague take the photograph. But that employee's supervisor did not agree with this proposal, and informed Ms. Clark that she would be criminally prosecuted if she declined to remove her hijab. Ms. Clark refused. Frustrated, the supervisor made numerous hostile comments about Muslims.

55. Ms. Clark was later taken to One Police Plaza, where, fearful of criminal charges and in tears, she reluctantly removed her hijab to be photographed. A female officer

took her photograph in a private room, but Ms. Clark observed a security camera in that room, and the officer subsequently showed the Booking Photograph to approximately five male NYPD officers. Male officers touched Ms. Clark repeatedly, even though she explained that such contact violated her religion, and denied her a place to wash for prayer and a place to pray.

56. Ms. Clark was agitated and distraught by the coerced removal of her hijab. Because of the violations of her religious rights that occurred in custody, Ms. Clark was afraid to wear her hijab for approximately one month after the incident.

57. Upon information and belief, the NYPD still maintains at least one photograph of Ms. Clark without her hijab. The existence of this photograph haunts Ms. Clark, who is distressed by the prospect of the photograph being viewed again and again by men who are not members of her immediate family.

***Arwa Aziz is Forced to Remove Her Hijab at Brooklyn's First Precinct for Three Photographs***

58. After her sister-in-law obtained a protective order against her on false pretenses and repeatedly requested that NYPD officers arrest Ms. Aziz for violations of the order she did not commit, Plaintiff Arwa Aziz voluntarily submitted herself to the NYPD's custody at the Sixty-Eighth Precinct in Brooklyn on August 30, 2017 after officers came to her home and threatened arrest.

59. After Ms. Aziz arrived at the precinct, NYPD officers took her photograph with her hijab on, then handcuffed her and drove her to Brooklyn Central Booking to be photographed again. Ms. Aziz was placed in the middle of a long hallway, with more than thirty male inmates lined up against the walls and approximately one dozen NYPD officers supervising them. There, in plain sight of these men, several officers demanded that Ms. Aziz remove her

hijab to be photographed. One officer said to another, “Does she know she has to take her hijab off?”

60. Ms. Aziz informed the officers that she could not remove her hijab, which she wears every day for religious reasons. The officers were unmoved. One informed her: “It’s the law.” When Ms. Aziz asked to speak to a supervisor, an older white officer said: “No, you have to take it off.” Officers told Ms. Aziz she could have her photograph taken “in a room” at One Police Plaza, but warned her they could not guarantee that a female photographer would be present there to take her picture. Furthermore, the officers threatened, Ms. Aziz would have to “restart” her booking process entirely if she chose to move to One Police Plaza. Ms. Aziz had already been at the precinct for close to an hour.

61. Desperate and tearful, Ms. Aziz begged the officers to allow her to keep her hijab on for the photograph. The officers refused. She asked if she could pull her hijab back only slightly to reveal her bangs and hairline. Even this request was unavailing. A male officer sitting at a nearby desk shook his head and the remaining officers would not budge. They reiterated their directive that she remove her hijab entirely.

62. Ms. Aziz, crying hysterically, pulled her hijab around her neck. Approximately five minutes elapsed while officers took three photographs of Ms. Aziz: one facing the front and one of each profile. The officers prolonged the ordeal of their photography and protracted the time Ms. Aziz went uncovered. Ms. Aziz wept throughout the entire ordeal. Some of the male prisoners lining the hallway, respectful of Ms. Aziz’s distress, turned their backs in an effort to afford her privacy. None of the police officers in the hallway gave Ms. Aziz this same courtesy.

63. Ms. Aziz has been wearing her hijab every day for nearly seven years. It is a part of her; she cannot describe herself without her hijab. Being forced to remove her hijab in public—and in the presence of numerous men who are not members of her immediate family—severely traumatized Ms. Aziz and caused her substantial and lasting emotional distress.

64. Ms. Aziz's suffering was particularly acute because her arrest took place on Eid Al-Fitr, one of the most significant holidays in the Muslim calendar. Ms. Aziz had planned to spend Eid preparing food for her family's traditional celebration. Instead, she spent that day alone, in a jail cell, having been forced to expose her bare head to dozens of men outside her *mahram*.

65. Upon information and belief, the NYPD still maintains at least three photographs of Ms. Aziz without her hijab. As with Ms. Clark, Ms. Aziz continues to experience distress and humiliation when she thinks about these photographs, which depict her uncovered in violation of her religious beliefs. The continued availability of these photographs prolongs and intensifies the NYPD's initial assault on Ms. Aziz's religious rights.

***Notices of Claim***

66. Plaintiffs all filed timely notices of claim that were served upon Defendant.

67. Hearings on the notices of Plaintiff Aziz and Plaintiff Turning Point were held pursuant to General Municipal Law § 50-h on February 28, 2018.

68. The City scheduled a hearing for Ms. Clark to occur in June 2017 pursuant to General Municipal Law § 50-h. Ms. Clark's counsel was informed of the hearing on less than twenty-four hours' notice and timely sought an adjournment to a date within ninety days from the service of Ms. Clark's notice of claim on the City of New York. Counsel received no

Case 1:18-cv-02334-AT-KHP Document 1 Filed 03/16/18 Page 19 of 27

response within the ninety-day period. On February 20, 2018, the City adjourned Ms. Clark's hearing by letter to April 16, 2018.

## CLASS ACTION ALLEGATIONS

69. Plaintiffs Clark and Aziz bring this suit as a class action under Federal Rule of Civil Procedure 23(b)(1)(A) and (b)(3), on behalf of themselves and other individuals similarly situated who were (a) arrested by or in the custody of the NYPD; (b) required to take a post-arrest Booking Photograph while in any NYPD facility; and (3) forced to remove any religious head covering for that Booking Photograph pursuant to the Photograph Policy or any other written or unwritten policy of the NYPD.

70. All of the members of the Class were injured as a result of Defendant's conduct.

71. The members of the Class are so numerous that joinder of all Class members is impracticable. On information and belief, the number of adults arrested in New York City per year ranged from nearly three hundred and thirty-five thousand in 2008 to nearly two hundred and forty thousand in 2017.[7] Upon information and belief, tens of thousands of residents of New York City are Muslim women who wear the hijab, and hundreds of thousands of residents of New York City wear headscarves, hats, wigs, turbans, or other head and/or hair coverings in accordance with their religious beliefs.

72. The questions of law and fact presented by Plaintiffs Aziz and Clark are common to other members of the Class. Among others, the questions of law and fact common to the Class are:

---

[7] *See* http://www.criminaljustice.ny.gov/crimnet/ojsa/arrests/index.htm (last accessed March 5, 2018).

a. Whether the NYPD's Photograph Policy, either on its face or as applied, violates the RLUIPA by imposing a substantial burden on the religious exercise of Class members;

b. Whether the Photograph Policy is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest;

c. Whether the Photograph Policy, either on its face or as applied, deprives Class members of their right to freely exercise their religion pursuant to the First Amendment to the Constitution of the United States and/or Article I, Section 3 of the Constitution of the State of New York; and

d. Whether Class members are entitled to relief and, if so, the nature and extent of that relief, including without limitation the amount of monetary damages.

73. Common issues of law and fact, including without limitation those set forth above, predominate over any individual issues.

74. The claims and practices alleged herein are common to all members of the Class.

75. The violations suffered by Plaintiffs Clark and Aziz are typical of those suffered by the Class, as all members of the Class were subjected to the forced removal of religious head coverings in a New York City facility after being arrested or entering police custody. The entire Class will benefit from the monetary relief sought.

76. Plaintiffs have no conflict of interest with any Class members, are committed to the vigorous prosecution of all claims on behalf of the Class, and will fairly and adequately protect the interests of the Class.

77. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendant.

78. Counsel competent and experienced in federal class action and federal civil rights litigation has been retained to represent the class. Emery Celli Brinckerhoff & Abady LLP is a law firm with offices in New York City with extensive experience in complex civil rights litigation and class action lawsuits. Council on American Islamic Relations New York is a non-profit organization in New York City with substantial experience in civil rights litigation and knowledge of New York religious communities.

79. This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class members is impracticable. The damages suffered by members of the Class, although substantial, are small in relation to the extraordinary expense and burden of individual litigation; therefore, it is highly impractical for such Class members to seek individual redress for damages.

80. There will be no extraordinary difficulty in the management of this Class action.

**FIRST CAUSE OF ACTION**
**The Religious Land Use and Institutionalized Persons Act**
**(42 U.S.C. § 2000cc)**

81. Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

82. The RLUIPA provides, in relevant part, the following: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person- (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)-(2).

83. Class Plaintiffs are "persons" as defined under the RLUIPA. *See* 42 U.S.C. § 2000cc-1(a) and 42 U.S.C. § 1997(3).

84. Class Plaintiffs' decisions to wear hijabs constitute a sincerely-held religious belief.

85. At all relevant times, Defendant met the definition of the term "government" under the RLUIPA. *See* 42 U.S.C. § 2000cc-5(4)(A)(i)-(iii).

86. At all relevant times, the locations where the NYPD takes Booking Photographs, including, but not limited to, One Police Plaza in Manhattan, 100 Centre Street in Manhattan, and 120 Schermerhorn Street in Brooklyn, where the events alleged in the complaint transpired, are federally-funded "institutions" as defined under the RLUIPA and the Civil Rights of Institutionalized Persons Act of 1980 ("CRIPA"), 42 U.S.C. § 1997(1)(B)(ii)-(iii).

87. At all relevant times, Class Plaintiffs were "residing in or confined to institutions" as defined under the RLUIPA when the events alleged above transpired.

88. Defendant's acts or omissions, policies, and customs substantially burdened Class Plaintiffs' religious exercise by requiring them to remove their hijabs to be

photographed while they were residing in or confined to One Police Plaza in Manhattan, 100 Centre Street in Manhattan, and 120 Schermerhorn Street in Brooklyn, respectively.

89. Defendant's acts or omissions, policies, and customs do not further a compelling government interest.

90. Defendant's acts or omissions, policies, and customs are not the least-restrictive means of furthering a compelling government interest.

91. As a direct and proximate result of Defendant's wrongful acts and omissions, Class Plaintiffs have sustained damages, and have suffered and continue to suffer mental anguish, physical and emotional distress, humiliation, and embarrassment.

92. Turning Point is a "person" as defined under the RLUIPA, *see* 42 U.S.C. § 2000cc-1(a) and 42 U.S.C. § 1997(3), and as a direct and proximate result of Defendants' unlawful conduct has sustained damages.

**SECOND CAUSE OF ACTION**
**Free Exercise Clause**
**(42 U.S.C. § 1983)**

93. Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

94. 42 U.S.C. § 1983 prohibits any person acting under color of state law, custom, or usage to deprive a citizen of rights secured by the Constitution.

95. At all relevant times, Defendant acted under color of state law.

96. Under the First Amendment to the Constitution of the United States of America, Class Plaintiffs have the right to freely exercise their religion.

97. By forcing Class Plaintiffs remove their hijabs for the Booking Photograph, Defendant deprived Class Plaintiffs of their right to freely exercise their religion in

Case 1:18-cv-02334-AT-KHP Document 1 Filed 03/16/18 Page 24 of 27

contravention of the Free Exercise Clause.

98. As a direct and proximate result of Defendant's unlawful discriminatory conduct, Plaintiffs have sustained damages, and Class Plaintiffs have suffered and continue to suffer mental anguish, physical and emotional distress, humiliation, and embarrassment.

**THIRD CAUSE OF ACTION**
**New York State Constitution, Article I, Section 3**

99. Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

100. Article I, Section 3 of the Constitution of the State of New York provides that: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind." McKinney's Const. Art. 1, § 3.

101. Defendant's policy requiring that arrestees who wear religious head coverings remove those head coverings to be photographed violates Article I, Section 3 by disallowing the free exercise of religion.

102. As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have sustained damages, and Class Plaintiffs have suffered and continue to suffer mental anguish, physical and emotional distress, humiliation, and embarrassment.

**FOURTH CAUSE OF ACTION**
**Declaratory Judgment**
**(Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201-02)**

103. Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth at length herein.

104. Defendant's conduct was intentional and made with reckless indifference to Plaintiffs' religious rights.

105. Plaintiffs' rights to the free exercise of religion were infringed upon and substantially burdened by Defendant's conduct.

106. Defendant's policy and custom of forcing the removal of religious head coverings for post-arrest photographs, including the hijabs worn by Ms. Clark and Ms. Aziz, is an unlawful and unconstitutional practice that infringes upon the rights of Plaintiffs and other Muslim women and religious adherents to freely exercise their religion without the interference of substantially burdensome government conduct.

107. Defendant's policy, practice, and custom caused and continue to cause Plaintiffs and other Muslim women and religious adherents harm.

108. Plaintiffs are entitled to a declaratory judgment that Defendant infringed upon and substantially burdened Plaintiffs' religious free exercise and continue to substantially burden the religious free exercise of other, similarly-situated Muslim women and religious adherents in violation of federal and state law and the United States Constitution.

109. Plaintiffs have a strong likelihood of succeeding on the merits of their claims.

WHEREFORE, Plaintiffs Clark and Aziz, on behalf of the Class, and Plaintiff Turning Point, respectfully request an order certifying this suit as a class action pursuant to Federal Rule of Civil Procedure 23, and request judgment against Defendant as follows:

a) Declaring that Defendant's discriminatory practices violate the RLUIPA, 42 U.S.C. § 2000cc *et seq*.; the Free Exercise Clause of the First Amendment to the United States Constitution; and Article 1, Section 3 of the New York State Constitution;

b) Enjoining Defendant, Defendant's agents, employees, and successors, and all other persons in active concert or participation with Defendant from requiring the removal of any religious head or hair coverings for the purpose of post-arrest photographs;

c) Requiring Defendant to adopt nondiscriminatory policies and practices to prevent encroachment on the religious rights of arrestees and detainees in the future;

d) Awarding such damages to Class members as will fully compensate them for their loss of rights and emotional distress suffered due to Defendant's unlawful conduct;

e) Awarding such damages to Plaintiff Turning Point as will fully compensate it for its diversion of resources and frustration of mission suffered due to Defendant's unlawful conduct;

f) Awarding punitive damages to all Plaintiffs;

g) Awarding all Plaintiffs reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action; and

h) Granting all Plaintiffs such other further relief as may be just and proper.

Dated: New York, New York
March 16, 2018

EMERY CELLI BRINCKERHOFF &
ABADY LLP

By: ______________________

O. Andrew F. Wilson
Emma L. Freeman
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

COUNCIL ON AMERICAN-ISLAMIC
RELATIONS NEW YORK

Albert F. Cahn
46-01 Twentieth Avenue
Queens, New York 11105
(646) 665-7599

*Attorneys for Plaintiffs*