# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------- X

GEHAD ELSAYED and LAILA IBRAHIM, on behalf of themselves and others similarly situated,

Plaintiffs,

- against -

CITY OF NEW YORK; NYPD Officer CHENISE BRODIE (Shield No. 28113); and NYPD Officers John and Jane Doe # 1, 2, 3, etc.,

Defendants.

---------------------------------------------------------------------- X

No.

**CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiffs, GEHAD ELSAYED and LAILA IBRAHIM, on behalf of themselves and others similarly situated, by and through their attorneys, Beldock Levine & Hoffman LLP and The Aboushi Law Firm, PLLC, as and for their Complaint, allege as follows:

## PRELIMINARY STATEMENT

1. According to the tenets of their Muslim faith, many Muslim women believe they are required to wear headscarves, known as hijabs, in front of any man who is not their immediately family member. To decide to wear the hijab is a lifelong decision, and a woman's hijab becomes a part of her.

2. If a Muslim woman who wears a hijab is arrested in New York City, it is the policy and practice of the NYPD to force her to remove her hijab in order to be photographed, often in front of male officers and other male detainees. The photograph of her without her hijab is then saved to a database, available to anyone with access, indefinitely.

3. In 2015, the NYPD changed its policy regarding photographs at the precinct only, allegedly allowing arrestees to take identification photographs with their head coverings in place. However, despite this 2015 change in policy, many Muslim women are still required to remove their hijabs at both the precincts and central booking.

4. The 2015 change also allegedly provided an "accommodation" to Muslim women during their Booking Photograph. The alleged "accommodation" requires arrestees, regardless of the borough of arrest, to be transported to the Mass Arrest Processing Center located in Manhattan which has limited hours of operation. The process can add hours, if not days, to the arrest processing time, and is inconsistently applied.

5. Plaintiffs Laila Ibrahim and Gehad Elsayed were both arrested and processed after the 2015 policy change. Neither were offered an accommodation of being transported to the processing center and were forced by NYPD officers to unveil in front of numerous men during their photographs at central booking.

6. In direct violation of their civil and constitutional rights, NYPD officers forced the Plaintiffs to remove their hijabs in the presence of men, including male officers and male detainees. Plaintiff Ibrahim was forced to remove her hijab both at the precinct and at central booking without any accommodation for her sincerely held religious beliefs.

7. The experiences of the Plaintiffs and the humiliation of being forced to unveil in front of male strangers happens to each Muslim women who is arrested in the City of New York.

8. This is a civil rights class action brought by Ms. Ibrahim and Ms. Elsayed, on behalf of themselves and others similarly situated, against the City of New York and its police department for its unlawful policy of requiring the removal of religious head coverings of Muslim women during photographs taken for post-arrest processing; for the substantial burden on their religious

practice in violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"); and for violation of the First, Fourth and Fourteenth Amendments of the United States Constitution, and for violations of New York state law.

9. Plaintiffs seek a class-wide judgment declaring the NYPD's current policy and practice unconstitutional in violation of RLUIPA and the United States Constitution.

10. Plaintiffs also seek a class-wide injunction enjoining the NYPD from continuing to enforce its unconstitutional policy and practice and directing the Defendants to implement all necessary measures to ensure that this policy and practice is not continued.

11. Plaintiffs also seek individually an award of compensatory and punitive damages, in an amount to be determined at trial.

12. Plaintiffs also seek, on their own behalf and on behalf of the members of the class, an award of attorneys' fees and costs, and such other relief as this Court deems just and equitable.

**JURISDICTION**

13. Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331.

14. This action arises, in part, under the Religious Land Use and Institutionalized Person Act, 42 U.S.C. §2000cc *et seq.*, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

15. Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367 over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

**VENUE**

16. Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as at least one of the Defendants resides in this

Case 1:18-cv-10566 Document 1-1 Filed 11/13/18 Page 4 of 28

district and a substantial part of the events and/or omissions were committed in this district.

## PARTIES

17. Plaintiff Laila Ibrahim is a resident of the resident of the City of New York, County of Queens, and State of New York.

18. Plaintiff Gehad Elsayed is a resident of the City of New York, County of Kings, and State of New York.

19. Defendant City of New York (the "City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain a police department, and does maintain the New York Police Department ("NYPD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

20. NYPD Officer Chenise Brodie (Shield No. 28113) is an NYPD Police Officer who unlawfully ordered the removal Plaintiff Ibrahim's hijab in violation of her religious beliefs and constitutional rights.

21. NYPD Officers John and Jane Doe # 1, 2, 3, etc., are NYPD Police Officers who unlawfully removed or failed to intervene in the removal of Plaintiffs' hijabs in violation of their religious beliefs and constitutional rights.

22. At all times relevant herein, Defendants Brodie, and NYPD Officers John and Jane Doe # 1, 2, 3, etc. have acted under color of state law in the course and scope of their duties and/or functions as agents, employees, and/or officers of the City and/or the NYPD, and incidental to the lawful pursuit of their duties as agents, employees, and/or officers of the City and/or the NYPD.

## COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW

23. Plaintiff Elsayed served a Notice of Claim upon the City of New York by personal service to the messenger service center at 100 Church Street, New York, New York on April 11, 2018, within ninety days of the events giving rise to her claims.

24. Plaintiff attended a hearing pursuant to section 50-h of the New York General Municipal Law on March 10, 2015.

25. Plaintiff Ibrahim served a Notice of Claim upon the City of New York by personal service to the messenger service center at 100 Church Street, New York, New York on August 1, 2018, within ninety days of the events giving rise to her claims.

26. More than thirty days have elapsed since Plaintiffs served a Notice of Claim and the City has not offered adjustment or payment thereof.

## JURY DEMAND

27. Plaintiffs demand a trial by jury in this action on each and every one of their claims for which a jury trial is legally available.

## STATEMENT OF FACTS

28. Plaintiffs Laila Ibrahim and Gehad Elsayed are both Muslim women who wear religious head coverings called hijabs—headscarves covering the ears, hair, and neck of the woman, but not the face—as an expression of their sincerely held religious beliefs.

29. Their beliefs are grounded in the Quran, Sunnah, and the Hadith.

30. For example, the Quran prescribes: "O believers, enter not the dwellings of the Prophet, unless invited . . . And when you ask of his wives anything, ask from behind a *hijab*. That is purer for your hearts and for their hearts." (Surat Al-Ahzab 33:53.)

31. To a Muslim woman, the veil becomes inextricably a part of herself: a form of her person and her being. To remove the veil from a women outside of her family is to debase her—violating not just her religion but her dignity.

32. The veil is worn at all times outside the presence of a Muslim woman's family including, but not limited to, for photographs seen on government-issued IDs such as driver's licenses and passport photos.

**The NYPD Photographic Unit Standard Operating Procedures**

33. NYPD Photographic Unit Photography Standard Operating Procedures version 1.1 ("Photo Unit SOP") governs the format for all post-arrest-processing photography at both the precincts and central booking.

34. Section 8 of the Photo Unit SOP provides direction for taking the front facing photograph. The photographer is directed to instruct the arrestee that the head must be straight. The prisoner should be facing and looking into the camera. Both eyes must be opened in a normal manner without squinting. The mouth should be closed unless injury or deformity prevents the mouth from closing. Long hair must be brushed or pushed away from the eyes and front of the face, which should be expressionless.

35. The Photo Unit SOP also provides that for side profile photographs: "the head has to be straight. . . eyes must be opened in a normal manner . . . mouth should be closed . . . the face should be expressionless . . . long hair must be pushed back and away from the ear [and] must be fully visible . . . thick garments cannot block the profile or the ear [and] as much of the neck as possible should be visible."

36. Nowhere does the Photo Unit SOP require the removal of religious head coverings. Instead, that policy emphasizes the importance of an unobstructed view of the face and ears for photographs taken at a precinct or central booking.

37. Upon information and belief, these photographs are then saved in the NYPD Photo Manager database and are shared with other law enforcement databases, making the photograph of arrestees without their religious head coverings visible to anyone with access to the databases—indefinitely.

**<u>Searches at Police Facilities</u>**

38. After arrival at the precinct and central booking, all arrestees are subjected to a custodial search.

39. Though all women are to be searched by a female officer, upon information and belief, because all non-strip searches are conducted in the same processing space, male police officers and/or male detainees are often present during the searches of Muslim women.

40. For example, in Patrol Guide Procedure No. 208-05, the NYPD provides "[u]pon arrival at precinct of arrest or other Department facility, the arresting officer (if he/she is of the same sex as prisoner) or another designated member of the same sex as the prisoner, shall conduct a thorough search of the subject's person and clothing to ensure the safety of all persons within the facility and to remove weapons, contraband, and evidence not recovered by the frisk."

41. Thereafter, the arrestee is taken back to the arrest processing section to continue the process with male officers.

42. Though the NYPD has the ability to make an accommodation for searches of their persons, the NYPD as a rule refuses to accommodate Muslim women who request that any photograph in front of men be taken in private.

**<u>Identification Photograph and Interim Order 29</u>**

43. The NYPD's written policy, (hereinafter jointly referred to as the "NYPD's Religious Head Covering Arrest Policy"), has two distinct stages with respect to photographing arrestees: at the precinct while processing the initial arrest (the "Identification Photograph"); and a second time while at central booking (the "Booking Photograph").

44. For years prior to 2015, the NYPD's Religious Head Covering Arrest Policy provided a discretionary policy for the removal of religious head coverings for photographs taken during post-arrest-processing at both the precinct and at central booking.

45. At both locations, the arresting officer would search them, enter the arrestee's pedigree information, take their photograph, and place them in a holding cell with other arrestees.

46. In 2015, the NYPD issued Interim Order 29 (hereinafter referred to as "IO 29"), which revised the NYPD's policy as it related to the Booking Photograph, targeted arrestees who refused to remove their religious head coverings, providing them the option to take the Booking Photograph at the Mass Arrest Processing Center (MAPC) located at One Police Plaza in Manhattan regardless of the borough of their initial arrest.

47. After the 2015 change, arrestees still must remove their religious head coverings for photographs taken at central booking, without same gender photographers or private rooms, or be transported to the MAPC.

48. IO 29 further states that "the photograph taken at the command of arrest for the Prisoner Movement Slip is not considered an official department photograph and that that photograph is taken for identification purposes only and may be taken while the arrestee wears the religious head covering."

Case 1:18-cv-10566 Document 1-1 Filed 11/13/18 Page 9 of 28

49. IO 29 left undisturbed the policy and practice of requiring all persons to remove their religious head covering for the "booking photo." At all central booking facilities throughout the City of New York, all individuals who wear religious head coverings are required to remove their head covering for a photograph even after a search.

50. IO 29 acknowledges that arrestees requesting a religious accommodation afforded thereunder will experience "delay due to operation requirements incumbent in using MAPC," that is, an arrestee's post arrest processing and arraignment could be delayed if MAPC is closed at the time of their processing.

51. IO 29, and the subsequent revised Patrol Guide Sections P.G. 208-03 and P.G. 208-07, theoretically eliminated all photographing of objecting arrestees in the Court Sections and only "accommodates" objecting arrestees at MAPC.

52. Transporting an arrestee to MAPC can substantially increase the processing time of an arrestee, adding hours and, in some instances, days to their arrest processing.

**The NYPD's Practice is Inconsistently Applied and Discretionary**

53. The NYPD continues an ad-hoc practice of requiring the removal of religious head coverings for post-arrest processing photographs at both the precincts and at central booking.

54. The NYPD's alleged policy allows officers at the Identification Photograph to use individual discretion as to whether or not they would allow a Muslim woman to keep her hijab on during an Identification Photograph.

55. However, during the Booking Photograph, the NYPD refuses to accommodate Muslim women though it does not cause an undue burden at central booking. Instead, the only accommodation provided, though inconsistently, is allowing women to be photographed at MAPC.

56. For example, Plaintiff Elsayed, on only one occasion, was permitted to keep her hijab on during the Identification Photograph. Both Plaintiffs were not provided the MAPC accommodation for their Booking Photograph, and were both forced to unveil.

57. Upon information and belief, NYPD officers have complete discretion when deciding whether or not the religious head covering must be removed.

**Prior Experiences of Plaintiff Gehad Elsayed**

58. Ms. Elsayed is an observant Muslim woman who wears the hijab, covering her hair and neck as part of her religious obligations. Pursuant to her religious beliefs, Ms. Elsayed does not show her hair to men who are not part of her immediate family.

59. At all times relevant to the Complaint, including the present, Ms. Elsayed is employed at a car dealership.

60. Her position requires her to deal with customers and she is frequently in communication with the NYPD when certain incidents with customers escalate.

61. Ms. Elsayed has been arrested on three prior occasions, in 2012, 2014, and 2017.

62. In June of 2012, Ms. Elsayed was required to remove her hijab while being photographed at the 62nd Precinct and at Central Booking.

63. At the Precinct, Ms. Elsayed requested that a female officer take her fingerprints, as physical contact with men who are not in her immediate family is against her religious beliefs. This request was denied and a male officer moved her hands during the fingerprinting process.

64. Ms. Elsayed was photographed by a female officer in a private room.

65. At her arrival to Central Booking, Ms. Elsayed was forced to remove her hijab for another photograph, despite her request for accommodation based on her religious beliefs, this time in the presence of male officers and detainees.

66. While at Central Booking Ms. Elsayed endured the laughs of male officers and sexual comments by male detainees who referred specifically to the fact that her hair was exposed.

67. In April of 2014, Ms. Elsayed was permitted to wear her hijab for the Identification Photograph, but was again forced to remove her hijab during the Booking Photograph.

68. Ms. Elsayed endured the extreme shame of being seen by men outside of her family without her hijab. As a result of her multiple experiences, she fears further interactions with the police, believing that they will once again force her to remove her hijab in violation of her religious beliefs

**Experience of Plaintiff Gehad Elsayed on March 14, 2018**

69. On March 14, 2018 at approximately 9:50 a.m., Ms. Elsayed was arrested for allegedly driving with a suspended license.

70. Ms. Elsayed was taken to the 72nd Precinct in Brooklyn for post arrest processing, which included fingerprinting and photographing. Plaintiff was permitted to keep her hijab for the Identification Photograph.

71. At approximately 8:30 p.m., Ms. Elsayed was transported to Brooklyn Court Section for further post arrest processing.

72. While waiting in a holding cell with other female arrestees, Ms. Elsayed was called by NYPD Officer JD1 to stand in front of a camera that was stationed in the center of the holding area.

73. This took place in the presence of seven male officers, a male photographer, and approximately twelve to fifteen male detainees who could all see her from where they were in the room.

74. Officer JD1 then directed Ms. Elsayed to remove her hijab for the photograph.

75. Ms. Elsayed told Officer JD1, as she had told prior officers and photographers during her prior arrests, that it was against her religious convictions to remove her hijab in the presence of men who were not members of her immediate family.

76. Officer JD1 insisted Ms. Elsayed remove her hijab and preceded to mock her request with three other male officers, all watching Ms. Elsayed struggle to maintain control of a central religious belief.

77. At no point did Officer JD1 inform Ms. Elsayed that she could be taken to MAPC for a booking photograph taken in a private room.

78. The male officers ridiculed Ms. Elsayed for wanting to keep on her hijab and one officer mocked her saying "this is not the place to ask for any favors."

79. Humiliated, panicked, and overwhelmed, Ms. Elsayed continued to plead with the photographer and the officer to keep her hijab on.

80. As the orders to remove her hijab continued, another officer approached Ms. Elsayed and told her to "cut out the crying and take that thing off."

81. With all eyes on her, Ms. Elsayed reluctantly and slowly slid her hijab to her shoulders.

82. The photographer began to take the photograph and Officer JD1 ordered that Ms. Elsayed remove her hijab completely.

83. Ms. Elsayed complied, and her photograph was taken as she held her hijab in her hands.

84. After her photograph was taken, Ms. Elsayed had a panic attack and experienced shortness of breath. She had pains in her stomach and head, and felt faint. She requested medical attention and was told that if she did not calm down that she would remain in Brooklyn Central

Booking for days. Ms. Elsayed tried to calm herself down but she was sitting among men who had seen her hair and she was traumatized for having been forced to violate her religious beliefs.

85. Ms. Elsayed asked Officer JD1 to hide her photograph so it would not be visible to everyone. However, these photographs are available indefinitely to anyone with access to the Photo Manager database within the NYPD, as well as all persons involved in post-arrest processing and prosecution.

**Experience of Plaintiff Laila Ibrahim**

86. Ms. Ibrahim is a stay-at-home mother of three and has been wearing the hijab for twenty years. She was born in Egypt and became a U.S. citizen in 2016. She has been married for 14 years.

87. On or about May 5, 2018, at approximately 1:00 A.M., New York Police Department ("NYPD") Officer Brodie (Shield No. 28113) and Officer John Doe 2 ("JD2") entered Plaintiff Laila Ibrahim's apartment while she was asleep.

88. The officers were responding to a call placed by Ms. Ibrahim's husband over a dispute.

89. Ms. Ibrahim, who speaks limited English, was awoken by her son and told that police officers wanted to talk to her.

90. Officers Brodie and JD2 asked Ms. Ibrahim if she had ripped up her husband's shirts during the dispute.

91. Ms. Ibrahim showed the officers the old, ripped up clothing and explained that the shirts were old and stained, and that she intended to throw them out prior to the dispute.

92. The officers then brought Mr. Ibrahim into the apartment and Mr. Ibrahim confirmed that the shirts were old and he had stopped wearing them.

93. Mr. Ibrahim did not intend to press charges, but the officers insisted that they still had to arrest Ms. Ibrahim, against Mr. Ibrahim's wishes and without his request.

94. Officer Brodie and JD2 called for another unit and two more officers, John Doe 3 ("JD3") and John Doe 4 ("JD4"), arrived to the scene.

95. The four officers took Ms. Ibrahim into custody and brought her down three flights of stairs, holding her by her upper arms while her wrists were in tightly fastened handcuffs.

96. Officers JD3 and JD4 placed Ms. Ibrahim in a patrol car and took her to 114th precinct located at 34-16 Astoria Blvd. South, Astoria, NY 11103.

97. Ms. Ibrahim was placed in a holding cell.

98. Ms. Ibrahim requested a translator several times, but Officer Brodie demanded that she shut up and stop crying, and that no translator would be provided.

99. Officers JD3 and JD4 pressured Ms. Ibrahim to say that she ripped the old, stained clothes with a knife or scissors, but Ms. Ibrahim maintained that she had only used her hands.

100. Officer Brodie again demanded that she "shut up" and "just cooperate" so the officers could finish the paperwork.

101. At approximately 3:30 a.m., Officers JD3 and JD4 removed Ms. Ibrahim from the holding cell and took her fingerprints.

102. Officer JD3 then directed Ms. Ibrahim to remove her hijab for the Identification Photograph.

103. Ms. Ibrahim informed Officer JD3 that she could not remove her hijab for religious reasons.

104. Despite this information, Officer Brodie ordered Officer JD3 and JD4 to physically remove Ms. Ibrahim's hijab.

105. Although it was extremely embarrassing and humiliating to do so, Ms. Ibrahim stood for her Identification Photograph, her hair exposed, in full view of Officers Brodie and JD2-4, two male arrestees, and five other male officers.

106. She had never been arrested before and was humiliated and terrified. With limited English proficiency, she was unable to communicate her needs and concerns.

107. Ms. Ibrahim continued to cry uncontrollably and had difficulty breathing, but was not offered medical attention.

108. Officers JD3 and JD4 walked Ms. Ibrahim back to the holding cell, removed her hijab from where it had been placed, down on her neck, and told her that she would not be allowed to put it back on.

109. At approximately 9:00 a.m, as she was getting ready to be transferred to Central Booking, a female Officer, Jane Doe 1, aggressively patted down Ms. Ibrahim in front of the male officers and arrestees.

110. At approximately 9:30 a.m. Ms. Ibrahim requested that the officers return her hijab before she left the precinct.

111. Only then, approximately six hours after taking her photograph, with her hair exposed for all in the precinct to see, did Officer Jane Doe 1 finally return Ms. Ibrahim's hijab.

112. Ms. Ibrahim was transferred to Queens County Court Section at approximate 9:30 a.m., arriving at approximately 10:30 a.m.

113. Upon arrival, Officer John Doe 5 ("JD5") directed Officer Jane Doe 1 to yet again remove Ms. Ibrahim's hijab.

114. With approximately fifteen to twenty men present in the room, most of whom were police officers, Officer Jane Doe 1 physically removed Mr. Ibrahim's hijab and placed it around her neck, exposing her hair to all present.

115. Ms. Ibrahim's fingerprints, and again her photograph, were taken and she was then placed in a holding cell with her hijab still draped around her neck.

116. With Ms. Ibrahim in the holding cell, Officer John Doe 6 ("JD6") began interrogating Ms. Ibrahim.

117. First, Officer JD6 asked Ms. Ibrahim if she was Muslim, to which she replied that she was.

118. Officer JD6 followed by asking her if she was a terrorist.

119. Offended and deeply hurt by the question, Ms. Ibrahim flatly denied the question.

120. Officer JD6 insisted Ms. Ibrahim was a terrorist and told her he knew she hated America.

121. Again, Ms. Ibrahim flatly denied the ridiculous and defamatory allegations.

122. Officer JD6 then asked if Ms. Ibrahim had been to Iraq or Syria, and if she and her husband were United States citizens.

123. Ms. Ibrahim continued to cry uncontrollably, feeling unprotected and exposed without being able to apply her hijab.

124. Officer JD6 indicated that he was obligated to ask her these questions because she is Muslim and wears a hijab.

125. Finally, after the series of offensive questioning, Ms. Ibrahim was allowed to put her hijab on when she was moved to a holding cell of female arrestees.

126. Ms. Ibrahim sat in the holding cell until 10:00 p.m., when she was transported to a courtroom for arraignment, where she was allowed to wear her hijab.

127. Immediately after her release, feeling violated, humiliated and exposed, Ms. Ibrahim cut her hair short, as her long hair had been defiled by the gazes of men outside her immediate family and reminded her of the trauma.

**<u>Experiences of Other Women</u>**

***Mervat Soliman***

128. On September 14, 2015, Mervat Soliman filed suit in response to her January 2015 arrest during which she requested, and was denied, a female photographer to take her arrest photograph at Central Booking.[1]

129. Following an incident where Ms. Soliman required medical treatment, her hijab was removed prior to her transport in the ambulance and withheld from her during her treatment.

130. Desperately trying to cover her exposed hair, Ms. Soliman resorted to donning a pillowcase as a substitute hijab during her treatment and throughout her time at the 104th precinct. During the Booking Photograph, Ms. Soliman was forced to remove her head covering and was denied the accommodation of a female photographer.

***J.H.***

131. On April 25, 2016, J.H. filed suit in response to her September 2015 arrest during which she was permitted to wear her hijab for her precinct photograph, but was forced to take off her hijab her Central Booking photograph where "[a]pproximately ten NYPD police officers and five detainees—all of whom were male—were also present."[2]

---

[1] *Soliman v. City of New York et al.*, 2015 WL 5343441 *3 (E.D.N.Y. March 31, 2017).
[2] *J.H. v. Bratton*, 248 F.Supp.3d. 401, 406 (E.D.N.Y. 2017).

132. Like Ms. Elsayed, J.H. endured stares and inappropriate comments of the men present in the room and felt "violated, embarrassed, and humiliated."[3]

***Rabab Musa***

133. On February 20, 2017, Rabab Musa filed suit in response to a September 2016 arrest during which she forced to remove her hijab and remain with her hair exposed for hours among male officers and detainees at two precincts.

134. In addition, a male officer took a picture of her without her hijab on his cell phone. Ms. Musa was ultimately released without any charges brought against her.[4]

***G.E.***

135. Following the decision in *G.E. v. City of New York*, No. 12-cv-5967 (RRM) (SLT), 2017 U.S. Dist. LEXIS 161905, 2017 WL 4357340 (S.D.N.Y. Sept. 2017), the NYPD conceded that removal of a hijab was unlawful for the taking of the Identification Photograph but continued to resist reaching the same conclusion with regard to the Booking Photograph.

136. Most recently, a class action lawsuit filed on March 16, 2018 also alleged a systematic and continuous violation of the religious freedoms of faith communities at the hands of the NYPD for the removal of religious head coverings for photographs taken at central booking.[5]

**CLASS ACTION ALLEGATIONS**

137. Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Plaintiffs Laila Ibrahim and Gehad Elsayed seek to represent a certified Plaintiff class consisting of all persons who have been or will be subjected to the NYPD's policy, practice, and/or custom of removing or forcing removal of Muslim women's hijabs worn as an expression of and adherence

---

[3] *Id.*
[4] *Rabab Musa v. City of New York et al.*, Index No. 151601/2017 (N.Y. Co. Sup. Ct. 2017).
[5] *Jamilla Clark et al., v. City of New York*, 1:18-cv-02334, 2018 WL 1366233 (S.D.N.Y.).

to their sincerely held religious beliefs in violation of, *inter alia*, the First, Fourth and Fourteenth Amendments of the United States Constitution, Religious Land Use and Institutionalized Persons Act, and the New York State Constitution (the "Class" or "Class Members").

138. The members of the class are so numerous as to render joinder impracticable.

139. In 2017, approximately 240,000 adults were arrested in New York City.[6]

140. Upon information and belief, approximately 3% of the residents in New York City are Muslim.[7]

141. Upon information and belief, thousands of Muslim women who wear the hijab have been harmed by the NYPD's policy and failure to implement their photograph policy in terms of their religious beliefs and would be members of the class.

142. The Class Members share a number of questions of law and fact in common, including, but not limited to:

a. Whether the NYPD engages in a policy, practice, and/or custom of forcing individuals with sincerely held religious beliefs to remove their religious head coverings in public in violation of their religious beliefs;

b. Whether the NYPD has a compelling governmental interest in maintaining its Religious Head Covering Arrest Policy;

c. Whether the existing Religious Head Covering Arrest Policy is the least restrictive means of furthering the NYPD's alleged compelling governmental interest;

---

[6] Adult Arrests: 2008-2017, NYPD, http://www.criminaljustice.ny.gov/crimnet/ojsa/arrests/nyc.pdf (last visited Oct. 15, 2018).

[7] https://www.prri.org/spotlight/religion-new-york-citys-five-boroughs/; *see also* Xenophobia, Islamophobia, and Anti-Semitism in NYC Leading Up to and Following the 2016 Presidential Election: A Report on Discrimination, Bias, and Acts of Hate Experienced by Muslim, Arab, South Asian, Jewish, and Sikh New Yorkers, NYC Comm'n on Human Rights, https://www1.nyc.gov/assets/cchr/downloads/pdf/publications/MASAJS_Report (last visited Oct. 15, 2018).

Case 1:18-cv-10566 Document 1-1 Filed 11/13/18 Page 20 of 28

d. Whether the NYPD's Religious Head Covering Arrest Policy is applied inconsistently; and

e. Whether the NYPD's Religious Head Covering Arrest Policy violates the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"); the First Amendment of the United States Constitution and of the constitution of New York State, and New York state law.

143. Like the other members of the class, Ms. Ibrahim and Ms. Elsayed have been victims of the NYPD's discriminatory practices, and have been humiliated by the inconsistently applied NYPD's Religious Head Covering Arrest Policy in which they are photographed in front of unauthorized men without their hijabs.

144. The legal theories under which Plaintiffs Ibrahim and Elsayed seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely, and the harms suffered by Plaintiffs Ibrahim and Elsayed are typical of the harms suffered by the class members.

145. Plaintiffs Ibrahim and Elsayed have strong personal interests in the outcome of this action, have no conflicts of interest with members of the Plaintiffs class, and will fairly and adequately protect the interests of the class. Plaintiffs Ibrahim and Elsayed have been victims of the NYPD's Religious Head Covering Arrest Policy, forcing off their hijabs. Absent this action, Plaintiffs and others similarly situated may experience continued violation of their constitutional rights.

146. Specifically, Ms. Elsayed, whose work requires her to frequently interact with the police, and who has been arrested on two other occasions, has been subjected to inconsistent

Case 1:18-cv-10566 Document 1-4 Filed 11/13/18 Page 21 of 28

application of the NYPD's Religious Head Covering Arrest Policy, is at risk of being arrested and subjected to such unconstitutional treatment imminently.

147. Plaintiffs Ibrahim and Elsayed are represented by Jonathan C. Moore and Luna Droubi of the law firm Beldock, Levine & Hoffman LLP ("BLH"), as well as Tahanie Aboushi of The Aboushi Law Firm, PLLC. BLH attorneys have litigated a number of class action lawsuits including, but not limited to: *Syed v. City of New York*, 16-cv-04789 (S.D.N.Y.) (PGG); *Floyd v. City of New York*, No.08-cv-1034 (S.D.N.Y.) (currently in the remedial stages); *Daniels v. City of N.Y.*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001) ("Aided by the capable hands of Jonathan C. Moore . . ., class counsel is undoubtedly qualified and experienced to conduct this litigation."); *see also MacNamara v. City of N.Y.*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011). Ms. Aboushi is an experienced civil rights litigator who has litigated a number of cases involving NYPD's Religious Head Covering Arrest Policy and forced removals of hijabs. *G.E. v. City of New York*, No. 12-cv-5967 (RRM) (SLT) (S.D.N.Y. 2017); *J.H. v. Bratton*, 248 F.Supp.3d 401 (E.D.N.Y. 2017); *Rabab Musa v. City of New York et al.*, Index No. 151601/2017 (N.Y. Co. Sup. Ct. 2017); *Soliman, v. City of New York et al.*, 2015 WL 5343441 (E.D.N.Y).

148. Plaintiffs counsel's firm has the resources, expertise, and experience to prosecute this action, and knows of no conflicts among members of the class or between the attorneys and members of the class.

149. The Class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendant City has acted on grounds generally applicable to the class, thereby making class-wide declaratory and injunctive relief appropriate.

## FIRST CAUSE OF ACTION

**(For Violations of Religious Freedoms Under the First and Fourteenth Amendments Pursuant to 42 U.S.C. § 1983)**

150. Plaintiffs repeat and reallege each and every allegation made in the foregoing paragraphs as if fully set forth herein.

151. The NYPD's Religious Head Covering Arrest Policy unreasonably interferes with the religious beliefs of the Plaintiffs and members of the class.

152. The Defendants' conduct alleged above targets religious exercise and violates the constitutional rights to the free exercise of religion.

153. The NYPD exercises discretion in a discriminatory manner because the policy is unequally applied.

154. The City's Religious Head Covering Arrest Policy violates the Plaintiffs and Class Members' free exercise of religion, in violation of the First and Fourteenth Amendments of the United States Constitution.

155. The Defendants have acted with deliberate indifference to the constitutional rights of Plaintiffs and other members of the class. As a direct and proximate result of the acts and omissions of the Defendant, the constitutional rights of Plaintiffs and other class members have been violated.

156. By acting under color of state law to deprive Plaintiffs and the Class of their rights under the First and Fourteenth Amendments, the Defendant, through its agents, employees and representatives, is in violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

157. As a direct and proximate result, Plaintiffs and the Class have suffered injuries and damages set forth above.

158. The Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

159. Plaintiffs and the Class have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless the Defendant City is enjoined from continuing the NYPD's policy, practice, and/or custom of religious discrimination that have directly and proximately caused such constitutional abuses.

**SECOND CAUSE OF ACTION**
**(For Violations of Religious Freedoms Under the Fourth and Fourteenth Amendments Pursuant to 42 U.S.C. § 1983)**

160. Plaintiffs repeat and reallege each and every allegation made in the foregoing paragraphs as if fully set forth herein.

161. The NYPD's Religious Head Covering Arrest Policy unreasonably interferes with the Fourth and Fourteenth Amendment rights of the Plaintiffs and members of the class to be free from unreasonable searches and seizures.

162. Although the Defendants have the rights, based on the arrest of the Plaintiffs, to conduct a search of the Plaintiffs, the manner in which these searches are being conducted are unreasonable and unrelated to any legitimate or compelling police or law enforcement objective.

163. The Defendants have acted with deliberate indifference to the constitutional rights of Plaintiffs and other members of the class. As a direct and proximate result of the acts and omissions of the Defendant, the constitutional rights of Plaintiffs and other class members have been violated.

164. By acting under color of state law to deprive Plaintiffs and the Class of their rights under the Fourth and Fourteenth Amendments, the Defendant, through its agents, employees and

representatives, is in violation of 42 U.S.C. § 1983, which prohibits the deprivation under color of state law of rights secured under the United States Constitution.

165. As a direct and proximate result, Plaintiffs and the Class have suffered injuries and damages set forth above.

166. The Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

167. Plaintiffs and the Class have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless the Defendant City is enjoined from continuing the NYPD's policy, practice, and/or custom of religious discrimination that have directly and proximately caused such constitutional abuses.

**THIRD CAUSE OF ACTION**
**Religious Land Use and Institutionalized Person Act**
**(42 U.S.C. § 2000cc *et seq.*)**

168. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

169. Plaintiffs and the Class have a sincere religious belief that their head, neck, and chest should be covered whenever they are in the presence of "unauthorized" men, which includes any men who are not their husband, father, brother, or son.

170. Plaintiffs and the Class "resid[ed] in or [were] confined to an institution" pursuant to RLUIPA.

171. To comply with this religious belief, Plaintiffs and Class Members wear a hijab whenever they may be in the presence of unauthorized men.

172. Plaintiffs and Class Members sincerely believe that removing the hijab in the presence of unauthorized men is morally wrong and a violation of their religious convictions.

173. By forcing Plaintiffs and Class Members to remove their hijabs at the time of their arrest, the Defendants substantially burdened their religious beliefs.

174. By forcing Plaintiffs and Class Members to remove their hijab in the presence of unauthorized men for their photograph at central booking, Defendants substantially burdened their religious beliefs.

175. By forcing Plaintiffs and Class Members' photographs without their hijabs to remain in a database available to anyone with access, Defendants substantially burdened their religious beliefs.

176. The Defendants had no compelling interest in removing Plaintiffs and/or Class Members' hijabs at the time of their arrest.

177. Defendants had no compelling interest in forcing Plaintiffs and/or Class Members to remove their hijab in the presence of unauthorized men for their photograph at central booking.

178. Defendants had no compelling interest in giving unauthorized men unlimited access to a photograph of Plaintiffs and/or Class Members without their hijabs.

179. Defendants had less restrictive means of satisfying any compelling interests they may have with respect to securing and utilizing Plaintiffs and/or Class Members' photographs.

180. Defendants' treatment of Plaintiffs and/or Class Members thus violates rights secured by RLUIPA.

## <u>FOURTH CAUSE OF ACTION</u>
## Intentional Infliction of Emotional Distress

181. Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

182. Plaintiffs and/or Class Members are entitled to injunctive and declaratory relief and damages, without which they have been and will continue to be harmed.

183. The aforementioned removal of Plaintiffs' religious head coverings was extreme and outrageous, and exceeded all reasonable bounds of decency.

184. Defendants, including employees, servants and/or agents of Defendant City of New York, while acting within the scope and in furtherance of their employment committed the aforementioned conduct.

185. The aforementioned conduct was unnecessary, intentional and done for the sole purpose of causing severe emotional distress to Plaintiffs.

186. As a result of the aforementioned conduct, Plaintiffs suffered severe emotional distress, physical and mental injury, together with embarrassment, humiliation, shock, fright and loss of freedom.

187. As a result of Defendants' impermissible conduct, Plaintiffs demand judgment in a sum of money to be determined at trial and that an award of attorney's fees is appropriate pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiffs demand the following relief against the Defendants:

a. Enter an order certifying this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure in the manner described above herein, with Plaintiffs Laila Ibrahim and Gehad Elsayed as class representatives;

b. Issue a class-wide declaratory judgment that the NYPD's policy of removing or forcing removal of Muslim women's hijabs for department photographs challenged herein violates the First, Fourth and Fourteenth Amendments of the United States Constitution, RLUIPA, and the New York State Constitution;

c. Declare NYPD that Defendants' actions of forcibly removing or compelling removal of Plaintiffs' hijabs while in the presence of unauthorized men violated RLUIPA and other constitutional and statutory rights;

d. Declare that giving unauthorized men access to class member photographs of them without their hijab violated RLUIPA and other constitutional and statutory rights;

e. Issue a permanent injunction enjoining Defendant City of New York and the NYPD from forcibly removing, compelling removal, or withholding of hijabs or other religious garb from religious believers who are detained by Defendant or in Defendant's custody.

f. Retain jurisdiction in this case until the unlawful conditions, practice, policies, acts and omissions complained of herein no longer exist and this Court is satisfied that they will not recur;

g. Award Plaintiffs Ibrahim and Elsayed compensatory and punitive damages in an amount that is fair, just and reasonable, to be determined at trial;

h. Award Plaintiffs, and the members of the class, reasonable attorneys' fees and costs; and

i. Grant such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Case 1:18-cv-10566 Document 1 Filed 11/13/18 Page 28 of 28

Dated: November 13, 2018
New York, New York

BELDOCK LEVINE & HOFFMAN LLP

By: ______________________
Jonathan C. Moore, Esq.
Luna Droubi, Esq.
99 Park Avenue, PH/26th Floor
New York, New York 10016
t: (212) 490-0400
e: jmoore@blhny.com
ldroubi@blhny.com

THE ABOUSHI LAW FIRM, PLLC

By: /s/
Tahanie A. Aboushi, Esq. (TA6529)
1441 Broadway Suite 5036
New York, NY 10018
t: (212) 391-8500
e: tahanie@aboushi.com

*Attorneys for Plaintiffs*